**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| POWER BUYING DEALERS USA, INC., a Delaware corporation, CR@ZY US, LLC, a North Carolina limited liability company, and POWER ENERGY CORPORATION, a Delaware corporation, | ) ) ) ) ) | |
| | ) | Case No. 1:21-cv-3154 |
| Plaintiffs, | ) ) | Judge Sharon J. Coleman |
| v. | ) ) | Magistrate Judge Jeffrey T. Gilbert |
| JUUL LABS, INC., a Delaware corporation, and HS WHOLESALE, LIMITED, an corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs, POWER BUYING DEALERS, USA, INC., CR@ZY US, LLC, and POWER ENERGY CORPORATION, by and through their counsel, Gary Grasso and Adam Bowers of the Grasso Law, P.C. law firm, and for their Second Amended Complaint alleging injury in their businesses and property by reason of defendants' acts, complain as follows:

## INTRODUCTION

This action is brought under Section 2 of the Clayton Act (also known as the Robinson-Patman Act, 15 U.S.C. § 13) and Section 4 of the Clayton Act (15 U.S.C. § 15) to recover threefold the damages sustained by plaintiffs, plus plaintiffs' cost of suit, including reasonable attorneys' fees, and interest, by reason of defendants' violation of 15 U.S.C. §§ 13(a), 13(d), 13(e), and 13(f) caused by defendant Juul Labs, Inc.'s price discrimination and the furnishing of discriminatory payments, as well as the furnishing of discriminatory services and facilities, for promotions provided to

1

retailers. It is based upon certain economic incentives that Juul Labs, Inc. provided to plaintiffs' competitors in the sale and resale of JUUL devices and other JUUL products purchased by the competitors and plaintiff PBD USA from Juul Labs, Inc., which incentives have not been made functionally available to PBD USA or made available to PBD USA on proportionally equal terms. This discrimination has resulted in substantially lower net prices being paid for JUUL devices and other JUUL products by plaintiffs' competitors in the states in which PBD USA and HS Wholesale compete and elsewhere than those paid by PBD USA for devices and other products of like grade and quality in contemporaneous sales by defendant Juul Labs Inc. These substantial price differences have continued over a significant period of time and have substantially lessened competition between plaintiffs and the favored competing distributors. As a result of this discrimination in violation of the Robinson-Patman Act, plaintiffs have suffered, and will continue to suffer, injury to their business and property in the form of lost sales, revenues, and profits.

## THE PARTIES

1.      Plaintiff Power Buying Dealers USA, Inc. ("PBD USA") is a corporation existing under the laws of the State of Delaware and is authorized to do business in the State of Illinois. PBD USA's primary place of business is located at 572 West Lake Street, Elmhurst, Illinois.

2.      Plaintiff Cr@zy Us, LLC ("Cr@zy Us") is a limited liability company existing under the laws of the State of North Carolina and which does business in

Illinois. Cr@zy Us's primary place of business is located at 101 Stonykirk Road, Pinehurst, North Carolina 28374.

3. Plaintiff Power Energy Corporation ("Power Energy") is a corporation existing under the laws of the State of Delaware and is authorized to do business in the State of Illinois. Power Energy's primary place of business is located at 572 West Lake Street, Elmhurst, IL 60126.

4. Defendant Juul Labs, Inc., ("Juul Labs") is a corporation existing under the laws of the State of Delaware. Juul Labs conducts business in Illinois and in this District. Juul Lab's primary place of business is located at 560 20th Street, San Francisco, California.

5. Defendant HS Wholesale Limited ("HS Wholesale") is a corporation existing under the laws of the State of Illinois. HS Wholesale conducts business in Illinois and in this District. HS Wholesale's primary place of business is located at 511 Vista Avenue, Addison, Illinois. According to HS Wholesale's website last visited August 19, 2022, HS Wholesale is the "#1 National Vape, Smoke Shop and JUUL Distributor," and is a "trusted source" for such products "across the U.S."

## JURISDICTION AND VENUE

6. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 in that it raises a federal antitrust claim under Section 2 of the Clayton Act, commonly known as the Robinson-Patman Act (15 U.S.C. § 13), and Section 4 of the Clayton Act (15 U.S.C. § 15).

7. Venue is proper pursuant to 15 U.S.C. §§ 15 and 22, and also pursuant to 28 U.S.C. § 1391(b)(2), (c)(2), and (d). Juul Labs has shipped products into this District. Moreover, the injury caused by Juul Lab's conduct substantially occurred in this District in that it inflicted harm on PBD USA which has its principal place of business in Elmhurst, Illinois, a community within this District.

8. This Court has personal jurisdiction over Juul Labs pursuant to 15 U.S.C. § 22 because Juul Labs is a company that transacts business and maintains substantial contacts in this District. Further, Juul Lab's conduct had the intended effect of causing injury to PBD USA, which is headquartered in this District.

9. This Court has personal jurisdiction over HS Wholesale pursuant to 15 U.S.C. § 22 because HS Wholesale is located in this District, does business in this District, and has inflicted injury on plaintiff, which is located in this District.

## FACTUAL ALLEGATIONS

### I. Background

10. In 2015, Pax Labs developed an electronic cigarette-like device that uses nicotine salts from leaf-based tobacco to deliver nicotine to adult smokers. The device was called "JUUL".

11. Juul Labs, Inc. was formed in May 2015 as a unit of Pax Labs.

12. In July 2017, Juul Labs, Inc. was spun out of Pax Labs as an independent company.

13. The e-cigarette device marketed by Juul Labs uses the trade name "JUUL".

4

14.    Like many startup companies that develop a new product, Pax Labs, and later its Juul Labs unit, did not have sufficient marketing personnel or expertise to market and distribute quickly and efficiently the JUUL device to wholesalers, retailers, and other channels of distribution.

## II.    The JUUL/PBD USA Relationship

15.    Beginning in 2015, Juul Labs turned to PBD USA to assist it in marketing and distributing the JUUL device.

16.    At the time that Juul Labs turned to PBD USA, PBD USA had a national network of convenience stores for which it undertook marketing, signage, promotions, merchandising, consumer engagement, and distribution.

17.    PBD USA was providing such marketing and other services to over 1500 locations in 28 states.

18.    PBD USA also had distribution centers commonly referred to in the industry as "depots". The depots were internal fulfillment centers open exclusively to PBD USA resellers, distributors, and sub-distributors. From its depots, PBD USA was also able to make direct store deliveries. These depots were located in PBD USA's eastern region, in the Midwest, in Houston, in PBD USA's western region, in Phoenix, and in Florida.

19.    Juul Labs was not able to undertake such direct store deliveries at all in some regions or efficiently in others.

20.    PBD USA also had relationships with multiple channels of distribution including resellers and sub-distributors. PBD USA also engaged in direct store

delivery to gas stations, convenience stores, cigar shops, tobacco stores, vape shops, and liquor stores.

21. Juul Labs did not have such multi-channel relationships.

22. As early as 2000, PBD USA had successfully designed a back-of-counter fixture that attractively displayed tobacco products in convenience stores and other retail stores. Such fixtures were commonly known in the industry as "back-bar" fixtures. They were non-self-service fixtures in that the consumer was not able to directly access the tobacco products displayed.

23. At the time that Juul Labs turned to PBD USA, PBD USA had successfully placed this back-bar fixture in over 1500 locations nationwide.

24. The over 1500 locations where PBD USA had placed its back-bar fixture also had entered into agreements with PBD USA which included the location's agreement that PBD USA would provide merchandising services to the location. Such merchandising services included a regular "re-set" not only of the placement on the fixture of a particular product but also the type of products to be displayed in the fixture. Based on data from various sources such as category captains and wholesalers which PBD USA obtained, PBD USA would create plans known as "Plan-O-Grams" showing the best placement on the fixture for a particular product and the types of tobacco products most likely to sell.

25. Pax Labs wanted to take advantage of PBD USA's work regarding these back-bar fixtures to utilize space in the fixture for the JUUL device and other JUUL

products, as well as to utilize and take advantage of the planning and merchandising services that PBD USA provided to these locations with the back-bar fixture.

26.     PBD USA also had a leaner management structure and management team compared to many of the large corporate convenience store chains, such as 7-11 and Speedway.

27.     PBD USA, therefore, offered JUUL Labs a more nimble and efficient business partner to place JUUL devices and other products quickly into the market.

28.     In early 2015, executives of Pax Labs met with Sam Odeh, the President of PBD USA, to develop a program for PBD USA to market and distribute the JUUL device.

29.     The Pax Labs executives meeting with and communicating with Mr. Odeh included Marty Young, the Director of Strategic Accounts for Pax Labs.

30.     Mr. Young and the other executives of Pax Labs worked with Mr. Odeh to develop a multi-faceted marketing and distribution program for PBD USA to market and distribute the JUUL device.

31.     In August 2016, Tyler Goldman, the CEO of Pax Labs, and four other executives of Pax Labs visited PBD USA in Elmhurst to meet personally with Mr. Odeh and Jeff Panfil, an independent contractor working as PBD USA's Marketing and Sales Director.

32.     Mr. Goldman informed Mr. Odeb that the purpose of his visit was to see firsthand the various facets of the PBD USA program for marketing JUUL devices and other JUUL products in action.

33.     In order to see the facets of the PBD USA marketing and distribution program, Mr. Goldman not only toured and inspected PBD USA's convenience store facility in Elmhurst, but also visited and inspected a Mobil Oil service station and convenience store at Mannheim Road and Higgins Road in the Chicago suburbs.

34.     Mr. Goldman affirmed Pax Labs' commitment, and the commitment of its Juul Labs unit, to all facets of the PBD USA marketing and distribution program approved by Mr. Goldman and the other Pax Labs executives.

35.     Throughout the period 2016 and through the first half of 2017, PBD USA pursued the marketing and distribution program approved by Mr. Goldman and the other Pax Labs executives.

36.     In July 2017, Juul Labs was spun out of Pax Labs as an independent company and Tyler Goldman became the CEO of the independent Juul Labs, Inc.

37.     During the second half of 2017 though the first half of 2018, executives of Juul Labs communicated by telephone, email, and letters with Sam Odeh and Jeff Panfil regarding the marketing and distribution program, praising the work PBD USA was doing with the program, and reaffirming Juul Lab's commitment to the program.

38.     PBD USA continued the marketing and distribution program in reliance on its communications with Mr. Goldman and others at Juul Labs.

39.     From late 2017 to mid to late 2018, PBD USA ramped up its marketing and distribution program for the JUUL devices and other JUUL products. This included significant purchases of JUUL devices and pods by PBD USA for

distribution by PBD USA to retailers and other channels of distribution, as well as significant investments by PBD USA in the back-of-the-counter display fixtures and the countertop displays specifically designed for JUUL devices and other JUUL products.

40. Executives at Juul Labs between late 2017 and late 2018 were well-aware of PBD USA's efforts to market and distribute JUUL devices and other JUUL products and in emails and telephone communications, encouraged PBD USA to continue such efforts.

41. Significantly, executives of Juul Labs in the second half of 2017 and the first half of 2018 toured various retailers where PBD USA had placed JUUL devices and other JUUL products in the back-bar fixture, had convinced the retailer to install the acrylic countertop display, had placed point-of-sale signage and other marketing materials at the convenience stores or other retailers, and had kept the back-bar fixtures and acrylic countertop displays stocked with JUUL devices and other JUUL products.

42. Specifically, Jordan Nicgorski, Corey Agin, John Schwartz, and Mark Mcleod were executives of Juul Labs that communicated with Mr. Odeh and others at PBD USA including Jeff Panfil, about PBD USA's marketing and distribution, and visited retail sites where PBD USA had executed the various facets of the marketing and distribution program.

43. In reliance on the emails and telephone communications from Juul Labs from late 2017 to late 2018 encouraging PBD USA to continue its marketing and

distribution efforts, PBD USA incurred significant expense in its marketing and distribution program.

44.     At no time during the period from August 2016 through July 2018 did anyone at Juul Labs, or its predecessor Pax Labs, indicate that PBD USA should stop implementing any facet of the PBD USA marketing and distribution program.

45.     Executives at Juul Labs, including Jordan Nicgorski, Corey Agin, John Schwartz, and Mark Mcleod, were well aware of the benefit that Juul Labs obtained from PBD USA executing on the various facets of the PBD marketing and distribution program and expressed their gratitude to Mr. Odell and Mr. Panfil for those benefits flowing from PBD USA's efforts.

46.     Notwithstanding the foregoing history of PBD USA's conduct benefitting Juul Labs, beginning in early 2018, a new management team at Juul Labs began favoring other distributors like HS Wholesale to the detriment of PBD USA.

### III.    Allocations and Price Discrimination: Summer 2018 Promotion

47.     Beginning in May 2018, Juul Labs undertook a sales promotion program to run from May 28, 2018 through July 15, 2018.

48.     Under this program, distributors like PBD USA and HS Wholesale would receive an $11.88 rebate on JUUL starter kits and a $9.56 rebate on JUUL basic kits to to be resold to various accounts.

49.     Juul Labs, however, capped the amount of total rebate available to a distributor by allocating to each distributor the number of starter kits and basic kits for which the rebate would be paid.

50.     The rebate from Juul Labs to be paid to distributors for starter kits and basic kits to be resold to various accounts was effectively a price discount for the products sold to distributors like PBD USA and HS Wholesale by Juul Labs.

51.     On information and belief, HS Wholesale received a greater allocation of starter kits and basic kits than did PBD USA (Such information and belief is based on communications from PBD USA customers who reported that they were going to buy from HS Wholesale rather than from PBD USA because of HS Wholesale's greater allocation).

52.     By receiving a greater allocation of the starter kits and basic kits for which the rebate was payable, HS Wholesale effectively received a lower price for JUUL devices and pods than PBD USA.

## IV.    Allocations and Price Discrimination: Fall 2018 Promotion

53.     Beginning in June 2018, Juul Labs undertook a sales promotion program to run from June 16, 2018 through November 2018.

54.     Under this program, distributors like PBD USA and HS Wholesale would again receive an $11.88 rebate on JUUL starter kits and a $9.56 rebate on JUUL basic kits to be resold to various accounts.

55.     Juul Labs, however, capped the amount of total rebate available to a distributor by allocating to each distributor the number of starter kits and basic kits for which the rebate would be paid.

56.     The rebate from Juul Labs to be paid to distributors for starter kits and basic kits to be resold to various accounts was effectively a price discount for the products sold to distributors like PBD USA and HS Wholesale by Juul Labs.

57.     On information and belief, HS Wholesale received a greater allocation of starter kits and basic kits than did PBD USA. (Such information and belief is based on communications from PBD USA customers who reported to executives at PBD USA that the customers were going to buy from HS Wholesale rather than from PBD USA because of HS Wholesale's greater allocation).

**V.     Allocations and Price Discrimination: Spring 2019 Promotion**

58.     Beginning in February 2019, Juul Labs undertook a sales promotion program to run from February 24, 2019 through April 20, 2019.

59.     Under this program, retailers were to be offered $12.00 off of the JUUL 2-pack starter kit and $12.00 off the JUUL device kit.

60.     If wholesaler/distributors like PBD USA and HS Wholesale had inventory for the JUUL 4-pack starter kit, retailers would be entitled to $16.00 off the purchase price of the JUUL 4-pack starter kit.

61.     Juul Labs would fund back to the participating wholesalers/distributors 100 percent of the $12.00 discount on the 2-pack starter and device kits and 100 percent of the $16.00 discount for the 4-pack starter kit sold to retailers eom the wholesalers'/distributors' Inventory.

62.     Again, Juul Labs capped the amount of the funding to the wholesalers/distributors to provide such discounts to retailers by allocating each

wholesalers/distributor the number of starter kits for which the discount funding would be reimbursed.

63.     The funding of such discounts to retailers through the participating wholesalers/distributors was effectively a price discount for products sold to wholesalers/distributors like PBD USA and HS Wholesale.

64.     On information and belief, HS Wholesale received a greater allocation of starter kits and device kits than did PBD USA (Such information and belief is based upon communications from PBD USA customers who reported to executives at PBD USA that the customers were going to buy from HS Wholesale rather than PBD USA because of HS Wholesale's greater allocation).

## VI.    Discrimination with Returns

65.     During at least the period 2018 through 2019, Jura Labs would agree to accept returns for damaged or defective products from favored distributors that it would not agree to accept from others, including PBD USA.

66.     Juul Labs' practice of accepting returns from favored distributors was not functionally available to PBD USA.

67.     On information and belief, JUUL Labs accepted returns from HS Wholesale based on a policy not functionally available to PBD USA. (Such information and belief is based on conversations with retailer customers of PBD USA who complained that they were going to buy from HS Wholesale and stop buying from PBD USA because HS Wholesale had a better return policy from Juul Labs than PBD USA did).

68. Juul Labs' more favorable policy for accepting returns from HS Wholesale than its policy for accepting returns from PBD USA was effectively a price discount offered to HS Wholesale that was not functionally available to PBD USA.

69. JUUL Labs' policy for accepting returns was a price discount because distributors did not have to incur the expense of holding damaged or defective merchandise that it was not able to sell.

## VII. The Furnishing of Discriminatory Credits and Other Monetary Payments To Distributors To Enable Their Retailers to Provide Promotions

70. During the period at least :Born 2018 through 2019, Juul Labs provided various credits, monetary benefits, and incentive payments to favored distributors for the distributors to use to fund promotional items with their customers such as convenience stores, tobacco retailers, vape shops, and other channels of distribution.

71. Juul Labs did not furnish these credits, monetary benefits, and incentive payments to PBD USA.

72. On information and belief, Juul Labs furnished such credits, monetary benefits, and incentive payments to HS Wholesale. (Such information and belief is based upon conversations with retailer customers of both HS Wholesale and PBD USA).

73. The effect of the foregoing furnishing of credits, monetary benefits, and incentive payments to favored distributors such as HS Wholesale allowing them to provide promotional items to their customers was to injure, destroy, and prevent

competition to the advantage of the favored distributors in the states in which PBD USA and HS Wholesale compete.

74. Juul Labs' furnishing of credits, monetary benefits, and incentive payments to favored distributors to enable their retailers to provide promotions to the end-user customer were not available on proportionally equal terms to other distributors like PBD USA.

75. One example of such payments would be payments for meetings of retailers that exceeded the actual cost of the meetings.

76. On information and belief, Juul Labs made such payments for meetings to HS Wholesale that were not made available to PBD USA. (Such information and belief is based on conversations with retailer customers of PBD USA who complained that they were going to buy product from HS Wholesale and stop buying from PBD USA because Juul Labs made payments to HS Wholesale that enabled HS Wholesale to make payments to the retailers for promoting products to their end-use customers).

## VIII. The Discriminatory Furnishing of Services and Facilities to Distributors to Enable Their Retailers to Provide Promotions

77. In addition to providing monetary payments to favored distributors to facilitate promotions by the distributors' retailers to support sales to their end-use customers, Juul Labs has provided services and facilities to support such sales by the favored distributors' retailers.

78. Such services and facilities were not made available to all distributors like PBD USA on proportionally equal terms.

79.     One example of such services and facilities was to provide favored distributors the ability to obtain for their retailers JUUL neon signs and JUUL A-frame signs not otherwise available to the retailers of unfavored distributors on proportionally equal terms.

80.     On information and belief, HS Wholesale was able to obtain JUUL neon signs and A-Frame signs for its retailers more readily than PBD USA was. (Such information and belief is based on conversations with retailer customers of PBD USA who complained that they could obtain JUUL neon signs and A-Frames through HS Wholesale, but not through PBD USA).

81.     Another example of such services and facilities was to provide favored distributors with tent sales for their retailers which were not available to other distributors like PBD USA.

82.     On information and belief, Juul Labs provided such tent sales for the retailers of HS Wholesale that were not available to the retailers of PBD USA. (Such information and belief is based on conversations with retailer customers of PBD USA who complained that they were going to buy from HS Wholesale and stop buying from PBD USA because HS Wholesale was able to provide its retailers with tent sales and PBD USA was not).

## IX.     Effect of Juul Lab's Discrimination

83.     PBD USA and HS Wholesale are in direct competition for various customers for the distribution and sale of JUUL devices and other JUUL products in the states in which PBD USA and HS Wholesale compete.

84.     The JUUL devices and other JUUL products which HS Wholesale and PBD USA purchased from Juul Labs were of like grade and quality.

85.     The JUUL devices and other JUUL products which HS Wholesale and PBD USA purchased from Juul Labs were in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the JUUL devices and other JUUL products sold to HS Wholesale and PBD USA in the states in which PBD USA and HS Wholesale compete crossed state lines. Juul Labs regularly delivered products to PBD USA and HS Wholesale from outside of the states in which they were sold.

86.     The JUUL devices and other JUUL products that were subject to the discrimination were sold to HS Wholesale and PBD USA in contemporaneous sales.

87.     In the states in which HS Wholesale and PBD USA compete, the prices at which HS Wholesale and PBD USA resell JUUL devices and other JUUL products are a substantial factor in the decision of the customers of HS Wholesale and PBD USA regarding from whom to purchase JUUL devices and other JUUL products.

88.     The effective price differences resulting from the favorable allocation of JUUL devices and other JUUL products subject to the rebate, as well as the discriminatory returns policy, received by HS Wholesale compared to PBD USA were substantial and occurred over at least eighteen months.

89.     As a direct result of such price differences, customers of PBD USA were diverted to HS Wholesale.

90.    The discrimination in credits, monetary benefits, and incentive payments was substantial and occurred over at least 24 months.

91.    The discrimination in services and facilities was substantial and occurred over at least 24 months.

92.    As a direct result of the discrimination in monetary payment, as well as discrimination in the providing of services and facilities, for retailer promotions, customers of PBD USA were diverted to HS Wholesale.

93.    Specifically, personnel at PBD USA's customers Huckster, B&G Wholesale, Tobacco Discount Wholesale, and World Wholesale told Mr. Odeh that their companies were diverting purchases from PBD USA to HS Wholesale because of the greater allocation of JUUL devices subject to the rebate that HS Wholesale received from Juul Labs compared to PBD USA, more liberal returns policies, and discrimination in promotions and allowances.

94.    On information and belief other customers of PBD USA including but not limited to AK Wholesale, Oak Wholesale, McKee Distributing Inc., and Solid Gold Unlimited Inc., diverted purchases from PBD USA to HS Wholesale because of the greater allocation of JUUL devices subject to the rebate, the discriminatory return policy, and the discriminatory promotions and allowances. (Such information and belief is based on conversations that agents of PBD USA had with employees and others at PBD USA's customers).

## X.    The States in Which PBD USA and HS Wholesale Compete

95. On information and belief, PBD USA and HS Wholesale compete for customers for Juul products in the states of Illinois, California, Arizona, Nevada, Texas, New York, Pennsylvania, Michigan, Wisconsin, Indiana, Florida, Georgia and South Carolina. (Such information and belief is based on the statenent in HS Wholesale's website last visited on August 19, 2022 that HS Wholesale sells Juul products nationally and "across the U.S.").

96. PBD USA and HS Wholesale compete for sales JUUL devices to customers in the states in which PBD USA and HS Wholesale compete such as convenience stores, tobacco retailers, vape shops, and other channels of distribution.

97. Convenience stores, tobacco retailers, vape shops, and other channels of distribution will travel throughout a state to turn to substitute sources of JUUL devices and other JUUL products in response to a small significant and non-transitory increase in price offered by one distributor but not others.

## XI. Damages to Cr@zy Us and Power Energy

98. Plaintiffs Cr@zy Us and Power Energy were also damaged by the illegal conduct by defendants outlined in Paragraphs 10 through 97 above.

99. PBD USA had contracts and relationships with Cr@zy US and Power Energy in which they would approach convenience stores and other retailers with merchandise packages of a variety of products at discounted rates. These packages included, but were not limited to, JUUL devices, other JUUL products, and E85. E85 is an ethanol fuel blend of 85% ethanol fuel and 15% gasoline used to fuel vehicles.

Cr@zy US received incentive compensation as a percentage of every dollar over PBD USA's expenses.

100. By purchasing these merchandise packages, customers of PBD USA and Power Energy were able to save large amounts of money as compared to purchasing the different types of merchandise within the packages individually. The packages also allowed these customers to stock their convenience and retail stores more efficiently.

101. In addition to the Juul products and devices, the E85 product returned a large margin for PBD USA and Power Energy as part of these merchandise packages.

102. When Juul Labs engaged in the illegal conduct outlined in Paragraphs 10 through 97 above, however, sales of these merchandise packages to customers of PBD USA and Power Energy greatly declined, also reducing the incentive compensation to Cr@zy. Without the JUUL products and devices, the packages were no longer appealing to customers.

**COUNT I BROUGHT AGAINST JUUL LABS, INC. FOR VIOLATION OF SECTION 2(a) OF THE ROBINSON-PATMAN ACT, 15 U.S.C. § 13(a), REGARDING DISCRIMINATORY ALLOCATIONS AND REBATES**

103. Plaintiffs repeat and reallege Paragraphs 1 through 102 of this First Amended Complaint as if fully set forth herein.

104. At all relevant times to this action, plaintiff PBD USA defendant Juul Labs, and defendant HS Wholesale were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that

the devices sold to PBD USA and to the competing distributors like HS Wholesale in the states in which PBD USA and HS Wholesale compete crossed state lines. Juul Labs regularly delivered products to PBD USA and HS Wholesale from outside of the state in which they were sold.

105.   The JUUL devices and other JUUL products sold to PBD USA and the competing distributors in the states in which PBD USA and HS Wholesale compete were of like grade and quality.

106.   The JUUL devices and other JUUL products that were the subject of discriminations were sold to PBD USA and HS Wholesale in contemporaneous sales.

107.   Juul Labs discriminated in price between PBD USA and the competing distributors in the states in which PBD USA and HS Wholesale compete by offering rebates on a limited number of products based on allocations that discriminated between competing distributors. Such discrimination in price was for products of like grade and quality and in contemporaneous sales.

108.   The effect of the foregoing price discrimination was to injure, destroy, and prevent competition to the advantage of the competing distributors in the states in which PBD USA and HS Wholesale compete.

109.   The prices paid by competing distributors like HS Wholesale were not functionally available to plaintiffs.

110.   The foregoing price discrimination violates 15 U.S.C. § 13(a) of the Robinson-Patman Act.

111. As a direct result of Juul Lab's violation of 15 U.S.C. § 13(a), plaintiffs have sustained injury to their businesses and property in the form of, among other things, lost sales, lost profits, loss of customer goodwill, and loss of potential future sales of devices to repeat customers.

112. But for Juul Labs' conduct, Cr@zy Us and Power Energy also would have been able to make sales of JUUL and other products pursuant to the agreements and relationships between PBD USA Cr@zy Us, and Power Energy.

113. Because of Juul Lab's conduct, plaintiffs have ben injured in an amount in excess of $10 million.

**COUNT II BROUGHT AGAINST JUUL LABS, INC. FOR VIOLATION OF SECTION 2(a) OF THE ROBINSON-PATMAN ACF, 15 U.S.C. § 13(a), REGARDING DISCRIMINATORY RETURNS**

114. Plaintiffs repeat and reallege Paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115. At all relevant times to this action, plaintiff PBD USA defendant Juul Labs, and defendant HS Wholesale were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the devices sold to PBD USA and to the competing distributors like HS Wholesale in the states in which PBD USA and HS Wholesale compete cross state lines. Juul Labs regularly delivered products to PBD USA and HS Wholesale from outside of the state in which they were sold.

116.    The JUUL devices and other JUUL products sold to PBD USA and the competing distributors in the states in which PBD USA and HS Wholesale compete were of like grade and quality.

117.    The JUUL devices and other JUUL products that were the subject of discriminations were sold to PBD USA and HS Wholesale in contemporaneous sales.

118.    Juul Labs discriminated in price between PBD USA and the competing distributors in the states in which PBD USA and HS Wholesale compete by allowing returns of damaged or defective devices for credits based on a returns policy that discriminated between competing distributors. Such discrimination in price was for products of like grade and quality and in contemporaneous sales.

119.    The effect of the foregoing price discrimination was to injure, destroy, and prevent competition to the advantage of the competing distributors in the states in which PBD USA and HS Wholesale compete.

120.    The prices paid by competing distributors like HS Wholesale were not functionally available to PBD USA.

121.    The foregoing price discrimination violates 15 U.S.C. § 13(a) of the Robinson-Patman Act.

122.    As a result of Juul Labs' violation of 15 U.S.C. § 13(a), plaintiffs have sustained injury to their businesses or property in the form of, among other things, lost sales, lost profits, loss of customer goodwill and loss of potential future sales of devices to repeat customers.

123.    But for Juul Labs' conduct, Cr@zy Us and Power Energy also would have been able to make sales of JUUL and other products pursuant to the agreements and relationships between PBD USA, Cr@zy Us, and Power Energy.

124.    Because of Juul Labs' conduct, Plaintiffs have ben injured in an amount in excess of $10 million.

**COUNT III BROUGHT AGAINST JUUL LABS, INC.
VIOLATION OF SECTION 2(d) OF THE ROBINSON-PATMAN ACT, 15
U.S.C. § 13(d), REGARDING DISCRIMINATORY MONETARY PAYMENTS
TO DISTRIBUTORS TO FACILITATE THEIR RETAILERS' PROMOTIONS**

125.    Plaintiffs repeat and re-allege Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

126.    At all relevant times to this action, plaintiff PBD USA defendant Juul Labs, and defendant HS Wholesale were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the devices sold to PBD USA and to the competing distributors like HS Wholesale in the states in which PBD USA and HS Wholesale compete crossed state lines. Juul Labs regularly delivered products to PBD USA and HS Wholesale from outside of the states in which they were sold.

127.    During the period at least from 2018 through 2019, Juul Labs furnished credits, monetary benefits, and incentive payments to favored distributors like HS Wholesale to enable the favored distributors to provide promotional items to the favored distributors' customers such as convenience stores, tobacco retailers, vape shops, and other channels of distribution.

128.  Juul Labs did not make such credits, monetary benefits, and incentive payments available to PBD USA.

129.  Juul Labs was making other payments to favored distributors that enabled the favored distributors to provide promotional items to the favored distributors' retail customers.

130.  Such other payments included payments for meetings of retailers that exceeded the actual cost of the meetings.

131.  Juul Labs did not make such payments available to PBD USA.

132.  By furnishing credits and other payments to favored distributors like HS Wholesale but not to PBD USA to enable the favored distributors to fund promotional items, Juul Labs was making payments for promotional items not on proportionally equal terms.

133.  The furnishing of credits and other payments to favored distributors like HS Wholesale which were not available to PBD USA on proportionally equal terms allowed competing distributors in the states in which PBD USA and HS Wholesale compete who received such credits and other payments to fund promotional items and therefore to more effectively compete for the sale of JUUL devices and other JUUL products to their customers than could plaintiffs in competition with such distributors.

134.  The effect of the foregoing furnishing of credits and other payments to fund promotional items not available on proportionally equal terms to PBD USA was to injure, destroy, and prevent competition to the advantage of the favored competing distributors in the states in which PBD USA and HS Wholesale compete.

135. The foregoing furnishing of credits and other payments to fund promotional items not available to PBD USA on proportionally equal terms constituted a violation of 15 U.S.C. § 13(d) of the Robinson-Patman Act.

136. As a direct result of Juul Labs' violation of 15 U.S.C. § 13(d), plaintiffs have sustained injury to their businesses and property in the form of among other things, lost sales of devices, lost profits from device sales, loss of customer goodwill, and loss potential future sales of devices to repeat customers.

137. But for Juul Labs' conduct, Cr@zy Us and Power Energy also would have been able to make sales of JUUL and other products pursuant to the agreements and relationships between PBD USA Cr@zy Us, and Power Energy.

138. Because of Juul Lab's conduct, plaintiffs have been injured in an amount in excess of $10 million.

## COUNT IV BROUGHT AGAINST JUUL LABS, INC. FOR VIOLATION OF SECTION 2(e) OF THE ROBINSON-PATMAN ACT, 13 U.S.C. § 13(e), REGARDING DISCRIMINATORY SERVICES AND FACILITIES FOR PROMOTIONS

139. Plaintiffs repeat and reallege Paragraphs 1 through 138 of this Complaint as if fully set forth herein.

140. At all relevant times to this action, plaintiff PBD USA defendant JUUL Labs, and defendant HS Wholesale were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the devices sold to PBD USA and to the competing distributors, like HS Wholesale, in the states in which PBD USA and HS Wholesale compete cross states lines. Juul

Labs regularly delivered products to PBD USA and HS Wholesale from outside of the states in which they were sold.

141. The JUUL devices sold to PBD USA and the competing distributors in the states in which PBD USA and HS Wholesale compete were of like grade and quality, and in contemporaneous sales.

142. Juul Labs discriminated in providing services and facilities between PBD USA and the competing distributors in the states in which PBD USA and HS Wholesale compete by offering JUUL neon signs and JUUL A-Frame signs to enable the favored distributors to provide such services and facilities to the favored distributors' retailers to enhance sales by such retailers to their end-use customers.

143. The effect of the foregoing discrimination in the furnishing of services and facilities to favored distributors was to injure, destroy, and prevent competition to the advantage of the competing distributors in the states in which PBD USA and HS Wholesale compete.

144. The services and facilities furnished to distributions like HS Wholesale were not proportionally available to plaintiff.

145. The foregoing furnishing of discriminatory services and facilities violates 15 U.S.C. § 13(c) of the Robinson-Patman Act.

146. As a direct result of JUUL Labs' violation of 15 U.S.C. § 13(e), plaintiffs have sustained injury to their business and property in the form of, among other things, lost sales of devices, lost profits from device sales, loss of customer goodwill, and loss of potential future sales of devices to repeat customers.

147.    But for Juul Labs' conduct, Cr@zy Us and Power Energy also would have been able to make sales of JUUL and other products pursuant to the agreements and relationships between PBD USA Cr@zy Us, and Power Energy.

148.    Because of Juul Lab's conduct, plaintiffs have been injured in an amount in excess of $10 million.

**COUNT V BROUGHT AGAINST HS WHOLESALE LIMITED FOR VIOLATION OF SECTION 2(f) OF THE ROBHVSON-PATMAN ACT, 15 U.S.C. § 13(f), REGARDING RECEIPT OF DISCRIMINATORY TREATMENT**

149.    Plaintiffs repeat and re-allege paragraphs 1 through 148 of this Complaint as if fully set forth herein.

150.    At all relevant times to this action, plaintiff PBD USA defendant Juul Labs, and defendant HS Wholesale were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the devices sold to PBD USA and to the competing distributors in the states in which PBD USA and HS Wholesale compete crossed state lines. Juul Labs regularly delivered products to PBD USA and HS Wholesale from outside of the states in which they were sold.

151.    The devices sold to PBD USA and the competing distributors in the states in which PBD USA and HS Wholesale compete were of like grade and quality, and in contemporaneous sales.

152.    Juul Labs discriminated in price between PBD USA and the competing distributors like HS Wholesale in the states in which PBD USA and HS Wholesale compete. Such discrimination in price was for products of like grade and quality.

153.    The effect of the foregoing price discrimination was to injure, destroy, and prevent competition to the advantage of the competing distributors like HS Wholesale in the states in which PBD USA and HS Wholesale compete.

154.    The prices paid by competing distributors like HS Wholesale were not functionally available to PBD USA.

155.    HS Wholesale knowingly received discriminations in price prohibited by § 13(a) of the Robinson-Patman Act.

156.    The foregoing receipt of price discriminations by HS Wholesale violates § 13(f) of the Robinson-Patman Act.

157.    Juul Labs also furnished credits, monetary benefits and incentive payments, as well as services and facilities, to favored distributors like HS Wholesale to fund promotional items.

158.    Such furnishing of credits, monetary bene6tsl and incentive payments, as well as services and facilities, to and promotional items was not made available to PBD USA on proportionally equal terms.

159.    The furnishing of credits, monetary benefits, and incentive payments, as well as services and facilities, to fund promotional items to favored distributors like HS Wholesale but not available to others, including PBD USA, on proportionally equal terms had the effect of injuring, destroying, and preventing competition to the advantage of favored distributors like HS Wholesale in the states in which PBD USA and HS Wholesale compete.

160. HS Wholesale knowingly received credits, monetary benefits, and incentive payments, as well as services and facilities, to fund promotional item not made available to other distributors on proportionally equal team in violation of § 13(f) of the Robinson-Patman Act.

161. As a direct result of Juul Labs' violation of 15 U.S.C. § 13(a) and HS Wholesale's violation of 15 U.S.C. § 13(f), plaintiffs have sustained injury to their business and property in the form of, among other things, lost retail sales, lost profits, loss of customer goodwill and loss of potential future sales of devices to repeat customers.

162. But for Juul labs' and HS Wholesale's conduct, Cr@y Us and Power Energy also would have ben able to make sales of JUUL and other products pursuant to the agreements and relationships between PBD USA Cr@y Us, and Power Energy.

163. Because of the conduct of Juul Labs and HS Wholesale, plaintiffs have been injured in an amount in excess of $10 million.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, plaintiffs Power Buying Dealers USA Inc., Cr@zy Us, LLC, and Power Energy Corp respectfully request that judgment be entered against defendants Juul Labs and HS Wholesale, granting plaintiffs the following relief:

    a)    This Court adjudge and decree that defendants have unlawfully breached Sections 2(a), 2(d), 2(e), and 2(f) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), 13(d), 13(e), and 13(f);

b) Pursuant to 15 U.S.C. § 15(a), treble the damages that are shown to have been sustained by plaintiffs by reason of defendants' above-alleged violations, plus interest, costs, and reasonable attorneys' fees; and

c) This Court grant plaintiffs such other further and different relief as the nature of the case may require or as the Court may deem just and proper.

Dated: August 19, 2022

Respectfully submitted,

_____/s/_____Gary A. Grasso_____
By:     Gary A. Grasso, Esq.
        One of Plaintiffs' attorneys

Gary A. Grasso, Esq. (ARDC #3121760)
        ggrasso@grassolaw.com
Adam R. Bowers, Esq. (ARDC #6277163)
        abowers@grassolaw.com
GRASSO LAW, P.C.
38 S. Blaine Street, Suite 100
Hinsdale, IL 60521
(630) 654-4500

## DEMAND FOR JURY TRIAL

Power Buying Dealers USA Inc., Cr@zy Us, LLC, and Power Energy Corporation, by their attorneys, hereby demand pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, trial by jury of all issues so triable by right.

Dated: August 19, 2022

Respectfully submitted,

_____/s/_____Gary A. Grasso_____

By:    Gary A. Grasso, Esq.
        One of Plaintiffs' attorneys

Gary A. Grasso, Esq. (ARDC #3121760)
    ggrasso@grassolaw.com
Adam R. Bowers, Esq. (ARDC #6277163)
    abowers@grassolaw.com
GRASSO LAW, P.C.
38 S. Blaine Street, Suite 100
Hinsdale, IL 60521
(630) 654-4500

## CERTIFICATE OF SERVICE

The undersigned, being one of the attorneys of record in the above case, certifies that he caused a copy of the foregoing to be served upon opposing counsel of record via the Court's CM/ECF system on August 19, 2022.

_____/s/_____Adam R. Bowers_____
By:    Adam R. Bowers, Esq.
