**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| POWER BUYING DEALERS USA, INC., a Delaware corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-3154 |
| | ) | |
| JUUL LABS, INC., a Delaware corporation, | ) | |
| and HS WHOLESALE, LIMITED, an | ) | Judge Sharon J. Coleman |
| Illinois corporation, | ) | |
| | ) | Magistrate Jeffrey T. Gilbert |
| Defendants. | ) | |

## <u>THIRD AMENDED COMPLAINT AND JURY DEMAND</u>

NOW COMES the Plaintiff POWER BUYING DEALERS, USA, INC., a Delaware corporation, by its counsel, Gary Grasso and Adam Bowers of Grasso Law, P.C., and James Harrison of Walker Harrison, PLLC, pro hac vice, and for its Third Amended Complaint,[1] states:

## INTRODUCTION

A.    This four-count amended pleading is brought under Section 2 of the Clayton Act (also known as the Robinson-Patman Act, 15 U.S.C., chapter 1, § 13[2]) and Section 4 of the Clayton Act (15 U.S.C. § 15) to recover threefold the damages sustained by Plaintiff, plus Plaintiff's cost of suit, including reasonable attorneys' fees, and interest, by reason of Defendants' pricing discrimination, furnishing of discriminatory payments through discounts, rebates and credits and providing and accepting discriminatory opportunities to purchase products at issue, and their overall engaging in unlawful and anticompetitive conduct that damaged Plaintiff and ended its business.

---

[1] Per Judge Sharon Coleman ruling dated March 10, 2025, Dkt. 254.
[2] Discrimination in price, services or facilities.

B.     This action is based upon certain price incentives and insider buying opportunities that Defendant JUUL LABS, INC. (herein "JUUL") provided to Defendant HS WHOLESALE, LIMITED (herein "HSW"), in the sale and resale of JUUL device kits, starter kits, and refill kits (a/k/a pods) (collectively, "JUUL Products") and Plaintiff POWER BUYING DEALERS USA, INC. (herein "PBD"), which opportunities have not been made functionally available to PBD or made available to PBD on proportionally equal terms.

C.     JUUL discriminated against PBD and favored HSW in three successive marketing promotions of Juul vape delivery devices: the Summer 2018, Fall 2018, and Spring 2019 Promos. During these promos, JUUL knowingly provided -- and HSW knowingly received -- unlimited allocations of devices eligible for cost rebates while JUUL arbitrarily and improperly limited allocations that were also subject to rebates to PBD and other distributors.

D.     Additionally, JUUL also did not apply its announced pod price increases to HSW orders in August 2018, and in October 2018 improperly facilitated (through a "heads up" to HSW of a confidential internal decision to cease sales of flavored pods to distributors that was to be announced in mid-November) HSW's enormous orders which permitted HSW to stockpile flavored pods to give it a considerable market and price advantage as to PBD and other distributors.

E.     JUUL later engineered a sale of over 17,000 devices from PBD to HSW by offering HSW an 80% rebate to "blow out" sale of the devices without having offered that rebate incentive to PBD.  JUUL also created "off invoice" discounts varying from 3%, 4.5%, and 5%, and rebates for HSW that it denied to PBD.

F.     These discriminatory acts by JUUL with the understanding and participation of HSW in the receipt of price and allocation benefits resulted in substantially lower net prices being

paid for JUUL Products by HSW than those paid by PBD for Juul Products of like grade and quality in contemporaneous sales by defendant JUUL.

      G.     Defendants JUUL and HSW agreed and/or acted in concert with one another for their mutual benefit to give HSW price advantages in the market and especially at the expense of Plaintiff in the same channels and territories, and to discriminate in allocations of device and starter kits. Plaintiff suffered destructive injury to its business and property in the form of lost sales, revenues, and profits.

## THE PARTIES

      1.     Plaintiff POWER BUYING DEALERS USA, INC. (herein "PBD") is a corporation existing under the laws of the State of Delaware and is authorized to do business in the State of Illinois. PBD's primary place of business is located at 572 West Lake Street, Elmhurst, Illinois.

      2.     Defendant JUUL LABS, INC., (herein "JUUL") is a corporation existing under the laws of the State of Delaware. JUUL conducts business in Illinois and in this District. JUUL's primary place of business is located at 560 20th Street, San Francisco, California.

      3.     Defendant HS WHOLESALE, LIMITED (herein "HSW") is a corporation existing under the laws of the State of Illinois. HSW conducts business in Illinois and in this District. HSW's primary place of business is located at 511 Vista Avenue, Addison, Illinois. According to HSW's website, HSW is the "#1 National Vape, Smoke Shop and JUUL Distributor," and is a "trusted source" for such products "across the U.S."

## JURISDICTION AND VENUE

      4.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 in that it raises a federal antitrust claim under Section 2 of the Clayton Act,

commonly known as the Robinson-Patman Act (15 U.S.C. § 13), and Section 4 of the Clayton Act (15 U.S.C. § 15).

5.     Venue is proper pursuant to 15 U.S.C. §§ 15 and 22, and pursuant to 28 U.S.C. § 1391(b)(2), (c)(2), and (d). JUUL has shipped products into this District. Moreover, the injury caused by JUUL's conduct substantially occurred in this District in that it inflicted harm on PBD which has its principal place of business in Elmhurst, Illinois, which is geographically located within this District.

6.     This Court has personal jurisdiction over JUUL pursuant to 15 U.S.C. § 22 because JUUL is a company that transacts business and maintains substantial contacts in this District. Further, JUUL's conduct had the intended effect of causing injury to PBD, which is headquartered in this District.

7.     This Court has personal jurisdiction over HSW pursuant to 15 U.S.C. § 22 because HSW is headquartered in this District, does business in this District, and has inflicted injury to Plaintiff in this District.

## FACTUAL ALLEGATIONS

### I.     Background on JUUL and the JUUL Device

8.     In 2015, Pax Labs developed an electronic cigarette-like device that uses nicotine salts from leaf-based tobacco to deliver nicotine to adult smokers.

9.     JUUL was initially formed in May 2015 as a unit of Pax Labs.

10.     In July 2017, JUUL was spun out of Pax Labs as an independent company.

11.     The e-cigarette device marketed by JUUL also uses the trade name "JUUL" (for the purposes of pleading, also referred to herein as the "JUUL device").

12.     Like many startup companies that develop a new product, Pax Labs, and later its JUUL unit, did not have sufficient marketing personnel or expertise to market and distribute quickly and efficiently the JUUL device to wholesalers, retailers, and other channels of distribution.

## II.     PBD AS LEGACY CLIENT OF JUUL

13.     Beginning in 2015, JUUL turned to PBD to assist it in marketing, merchandising and distributing the JUUL nicotine delivery device and vaping pods.

14.     At the time that JUUL turned to PBD, JUUL knew that PBD had a national network of convenience stores for which it undertook marketing, signage, promotions, merchandising, consumer engagement, and distribution.

15.     PBD was providing such marketing, merchandising and other services to over 1500 locations in 28 states.

16.     PBD also had relationships with multiple channels of retailers through gas stations, convenience stores, cigar shops, tobacco stores, vape shops, and liquor stores.

17.     JUUL did not have such multi-channel relationships in the territories and retail channels that JUUL wanted to access for its products.

18.     In early 2015, executives of Pax Labs met with Sam Odeh, the President of PBD, to develop a program for PBD to market and distribute the JUUL device.

19.     Executives of Pax Labs worked with Mr. Odeh to develop a multi-faceted marketing and distribution program for PBD to market and distribute the JUUL device.

20.     Throughout the period 2016 and through the first half of 2017, PBD pursued and established the marketing and distribution program that it developed with Pax Labs. In consideration for these actions, Pax/Juul promised to compensate PBD with payments for business development in the locations and to rebate PBD for its sales of Juul Products

21.     In July 2017, JUUL was spun out of Pax Labs as an independent company.

22.     During the second half of 2017 though the first half of 2018, executives of JUUL communicated by telephone, email, and letters with Sam Odeh and Jeff Panfil of PBD regarding the marketing, merchandising and distribution program, praising the work PBD was doing with the program, and reaffirming JUUL's commitment to the program.

23.     PBD continued the marketing, merchandising and distribution program in reliance on its communications with JUUL.  JUUL referred to PBD as a legacy customer and distributor of Juul Products.

24.     From August 2016 to mid-to late 2018, PBD ramped up its marketing and distribution program for the JUUL devices and other JUUL products. This included significant purchases of JUUL devices and pods for distribution by PBD to retailers and other channels of distribution, as well as significant investments by PBD in the back-of-the-counter display fixtures and the countertop displays specifically designed for JUUL devices and other JUUL products.

25.     Between August 2016 and mid-2018, executives at JUUL were aware of PBD's successful efforts to market and distribute JUUL Products, and in emails and telephone communications, encouraged PBD to continue such efforts.

26.     In reliance on the emails and telephone communications from JUUL from August 2016 to mid-2018 encouraging PBD to continue its marketing, merchandising and distribution efforts, PBD devoted its entire business to being a distributor of JUUL Products and thereby incurred significant expense in its marketing, merchandising and distribution program, including the leasing of substantial warehouse space.

27.     At no time during the period from August 2016 through July 2018 did anyone at JUUL, or its predecessor Pax Labs, indicate that PBD should stop implementing any facet of the PBD marketing and distribution program.

28.     Notwithstanding the foregoing history, beginning in early 2018, a new management team at JUUL began favoring a local company near PBD, HSW, that had not marketed or sold Juul Products in any significant amount, if at all.

**III.     April 2018: HSW Executes a Distribution Agreement with JUUL**

29.     On or about April 9, 2018, HSW, without making any revisions to JUUL's proposed provisions, entered a new JUUL form "Distribution Agreement" (herein the "HSW DA") which immediately became illusory, especially as to territory and channel.  There were terms which JUUL never attempted to enforce.

30.     For example, the HSW DA purported to assign and define a "Territory" to HSW which encompassed "Central Illinois (zip code 60105)" and was limited to the "Authorized Channel" of "Head Shop/Vapor/Tobacco Shop".

31.     Section 2.12 of the HSW DA included a provision in which HSW agreed not to "(iv) sell to any Retailer outside of the Territory or within the Territory where it knows or has reason to know or suspect that the Retailer will sell the Supplier Products outside of the Territory; or (vii) sell or offer to sell, or otherwise transfer the Products via an Internet website, without having secured Supplier's advance written authorization in each instance…" (**Pl Exhibit 1-5**; Juullabs08795-8806).

32.     Upon executing the HSW DA, and supported by JUUL, HSW immediately began selling JUUL Products outside of its designated Territory and Channels.

33.     JUUL had conducted extensive business with PBD from the inception of their business relationship without a written contract.

34.     JUUL did not offer PBD a contract at this time, then later used the fact that PBD did not have a written contract with JUUL, which prior to this time was not required, as a reason to hold up PBD orders of Juul products.

35.     Just prior to the entry of the HSW DA, JUUL had hired Robert VanHoorebeck as its Vice President/General Manager of Central Region (herein "VanHoorebeck" or self-named "Bobby V"). Unknown to PBD, VanHoorebeck designated himself as the "owner" (referring to having chief responsibility) of only two distributor accounts – PBD and HSW.

36.     In 2018-2019, Bobby V was the Central Region Vice President (of the United States) with at least nine (9) direct reports and an additional 32 staff in this organizations chart. (**Pl Exhibit 2-7**, Juullabs08879)[3]. Nevertheless, Bobby V regularly and extensively intervened for HSW in its orders, payments, credits and overall business affairs with Juul.[4]

37.     In April 2018 when HSW executed the HSW DA, VanHoorebeck (along with JUUL finance department personnel) immediately allowed and encouraged HSW to sell JUUL devices and pods across all channels of trade anywhere in the United States.

38.     On April 16, 2018, just one week after executing the HSW DA, HSW's CEO Hammad Ahmad (herein "Ahmad") sent an email to VanHoorebeck requesting the contact information for JUUL personnel working in the Chicagoland market; outside HSW's central Illinois territory. (**Pl Exhibit 1-9**; Juullabs08782).

---

[3] All referenced Exhibits are marked AEO or confidential therefore are not attached due to the Protective Order entered by Judge Jeffrey Gilbert dated 10/8/2021 but have been served with a copy of the Third Amended Complaint on Defendants. Plaintiffs will seek leave of the Court to file exhibits under seal.
[4] Bobby V interventions for HSW can be found, inter alia, within a litany of emails noted in **Exhibit 2-108**.

39.     Also in April, 2018, JUUL supplied trade materials – a backdrop and pop-up banner – for an upcoming trade show to HSW. (**Pl Exhibit 1-10**; Juullabs09197). From time to time, JUUL provided various forms of trade support to HSW, but did not do so for PBD.  HSW, in turn, provided these marketing materials to its customers.

## IV.     May and June 2018: JUUL Continues to Favor HSW

40.     On May 2, 2018, Ahmad forwarded an email to VanHoorebeck showing promotional pricing for "Kwik Trip" on JUUL basic kits at $14.99, stating "Cant compete with this".

41.     VanHoorebeck responded: "Please note, that Kwik Trip doesn't get a break on costs, this is all done behind the scenes with our contract." (**Pl Exhibit 1-12**; Juullabs04041-4042).

42.     In disregard of the HSW DA, on May 10, 2018, HSW sent an email announcement to JUUL indicating that purchasers could place orders on its website, "hswsupply.com" and that "We ship to all 50 States in the U.S., Puerto Rico, Guam, U.S. Virgin Islands". (**Pl Exhibit 1-14**; Juullabs03926-3928).  JUUL did not enforce the territory or channel limits in the HSW DA.

43.     On May 17, 2018, VanHoorebeck provided a referral to Ahmad for a Shell Gas Station in Naperville, Illinois (outside of HSW's Territory), asking "Can you call him and get him set up as a customer and get product out today or tomorrow to him?" (**Pl Exhibit 1-18**; Juullabs08781).  VanHoorebeck never offered PBD that opportunity or similar ones.

44.     On May 18, 2018, JUUL's finance department allowed an HSW order to be processed with expedited shipment and without payment upfront. (**Pl Exhibit 1-19**; Juullabs09286).

45.     On June 15, 2018, VanHoorebeck emailed Ahmad with a "heads up" regarding then limited-edition Silver Basic Kits telling him that HSW could order early to get a jump on others.

46.     That same day, Ahmad responded by asking "Will pbd be getting it same time?" This email demonstrates that Ahmad knew HSW was competing with PBD.

47.     However, JUUL did not provide PBD the same "heads up" advantage of ordering early; VanHoorebeck stated he expected "inventory to be an issue first few months". (**Pl Exhibit 1-26**; HSW_000011-14). With the heads-up to order from Bobby V, Ahmad acted.

48.     With the heads-up to order from Bobby V, Ahmad ordered 24,000 units of the new silver kits.  Bobby V offered to have a JUUL employee assist with processing the order; as a result, HSW was able to place its order within 30 minutes of the "heads up" which provided it a substantial advantage (**Pl Exhibit 1-27**; HSW_000002), particularly given Bobby V's expectation of inventory shortages.

49.     Bobby V and JUUL provided no such assistance to PBD. To the contrary, Bobby V instituted a pattern of thwarting PBD from expanding its marketing and sales of Juul Products.

**V.     Allocations and Price Discrimination: Summer 2018 Promotion**

50.     Beginning in May 2018, JUUL undertook a sales promotion program to run from May 28, 2018 through July 15, 2018.

51.     Under this program, distributors like PBD and HSW would receive a $11.88 rebate on JUUL starter kits and a $9.56 rebate on JUUL basic kits to be resold to various accounts.

52.     However, JUUL capped the amount of total kits available to a distributor that were available for rebates by allocating to each distributor the number of starter kits and basic kits for which the rebate would be paid.

53.     The rebate from JUUL to be paid to distributors for starter kits and basic kits to be resold to various accounts was effectively a price discount for the products sold to distributors like PBD and HSW by JUUL.

54.    On June 9, 2018, Ahmad emailed VanHoorebeck, stating "I've had multiple customers come to me saying that they are still able to place multiple thousand-unit orders directly from Juul on the promo. This whole thing is leaving a bad taste in my mouth honestly. I'd like to have more transparency and clarity on what is really going on." (**Pl Exhibit 1-21**; HSW_000950).

55.    VanHoorebeck responded to Ahmad: "I gave you an allocation and you blew through it and have sold 2 times the amount I allocated to you… I have other wholesalers that are still selling as well as they have not blown through their inventory we gave them. However you were given 30 times any wholesaler. How do you feel left out or upset? I don't get it. I have done as much as I can for you. You even sold to our D2R customers. One of our largest and I didn't say anything." (Id.). ("D2R" means direct to retailers and was prohibited for distributors such as HSW.)

56.    In effect and knowing that device allocations are specifically tied to cost rebates lower their price to HSW, VanHoorebeck explicitly stated in this communication to Ahmad that HSW received a higher allocation than any other wholesaler *and* that JUUL had permitted HSW to sell outside its designated Channel and Territory.

57.    On June 10, 2018, Ahmad emailed VanHoorebeck: "I will always be infinitely indebted towards you for everything you've done for me. Don't ever forget that, regardless of what I say its only conversation. I know how hard you fought for myself and HS every step of the way… Let's see how things play out this week after I send the remainder of the data. Hopefully corporate sees value in sending us more allotment."

58.    HSW received a significantly greater allocation of starter kits and basic kits tied to cost rebates, thereby lowering their price to HSW than did PBD.

59.    Within this timeframe, PBD was allocated to sell 8,000 JUUL Starter Kits and 8,000 JUUL Device Kits, receiving a total of $171,519 in payouts from JUUL under the promotion.

And unlike JUUL's favorable treatment of HSW, what PBD sold in excess of its allocation could not be submitted to JUUL for promo rebates.

60.     However, within that same timeframe, HSW was permitted to sell 52,580 Device Kits (against its 36,000 allocation) and 44,934 Starter Kits (against its 22,000 allocation), receiving $523,773 in payouts under the promotion including for sales of kits outside and above the allocation to HSW. Indeed, HSW engaged in knowingly ordering kits regardless of purported allocation – and JUUL would fill each such order of kits regardless of allocations, and JUUL would apply credits to whatever HSW sold in violation of JUUL's policies.

61.     On June 28, 2018, VanHoorebeck addressed an email to Jacob Turner at JUUL with the "final sheet" and "promo" for HSW, stating that it would be necessary "to honor his last sheet even though its over allocation as I didnt communicate to him to shut off until I had confirmation we were not going to increase allocation. Which for HS was only 3 weeks of sales." (**Pl Exhibit 1-30**; Juullabs09219).

62.     On July 23, 2018, Jacob Turner at JUUL emailed JUUL Chief Sales Officer Bob Robbins (herein "Robbins"), stating "Wanted to reach out and make sure you were aware of / got your approval for an additional promo payout for HS Wholesale related to the summer promo. HS sent us 2 waves of claims – 1 for $524K, which we paid ahead of the original schedule per the call you and I were on with Bobby V to help them with working capital, and a 2nd Bobby V send following that…. This second claim takes us $431K over the communicated allocation. Bobby's note says he had not stopped them prior to hitting this, as we had originally planned to increase allocations but did not because of supply shortfall. Just want to make sure you're OK with us paying this out for the summer promo." (**Pl Exhibit 1-36**; Juullabs09218).

63.     Robbins responded, "Yes, good to pay that out. I know Bobby was being aggressive and using H&S to gain ground quickly out there. Central has had a good run and grown regional market share, due to pushes like this and a quick distro build." (Id.). Increasing sales of Juul products took precedence over equity and fairness to its distributors.

64.     By receiving a greater allocation of the starter kits and basic kits for which the rebate was payable, HSW effectively received a lower price for JUUL devices and pods than PBD.

65.     The fact that JUUL permitted HSW to sell nearly double its assigned allocation under this promotion, and received the entirety of the rebate payouts was not purely the unilateral action of VanHoorebeck; it was also approved and ratified by JUUL's Chief Sales Officer Robbins.

66.     The JUUL price discrimination favoring HSW over PBD is documented and demonstrated as set forth in **Exhibit PBD__Demo__000001**.

## VI.     JUUL Announces Prices Increases Which Were Not Implemented for HSW

67.     On June 28 and 29, 2018, JUUL announced to all distributors a price increase for JUUL pods from $8.10 to $9.40 (a $1.30/14% price per pod increase), that was to take effect on August 1, 2018.

68.     From July 2 through July 31, 2018, HSW and PBD each submitted pod orders to JUUL who invoiced HSW for $14.95 million of pod orders and invoiced PBD for $16.25 million of pod orders. **Exhibits PBD_Demo_000020 and 000018**, respectively.

69.     However, JUUL stopped PBD from placing additional pod orders yet did not implement the price increase to HSW and allowed HSW to order pods at $8.10/pod all through August 2018.

70.     From August 1, 2018 through September 12, 2018, JUUL invoices for orders on and after August 1, 2018 show that the pod price for HSW improperly remained unchanged; the price for HSW stayed at $8.10 per pod while PBD's price increased to $9.40.

71.     Previously, Ahmad complained to VanHoorebeck that he thought distributors were selling pods in May 2018 for $9.00 – asserting "I cannot compete" (JUULLABS04041) when the price difference was only 40 cents per pod. Ahmad did not object when HSW received a $1.30 advantage in pod pricing beginning August 1, 2018.

72.     In total, JUUL invoiced HSW for $22 million in $8.10 pods, amounting to an advantage of over $3.5 million. (2-116). JUUL never rescinded the price increase.  Thus, HSW had to know that it was receiving a substantial price advantage over other distributors.

**VII.    Allocations and Price Discrimination: Fall 2018 Promotion**

73.     Beginning in June 2018, Juu1 Labs undertook a sales promotion program to run from June 16, 2018 through November 2018.

74.     Under this program, distributors like PBD USA and HSW would again receive a $11.88 rebate on JUUL starter kits and a $9.56 rebate on JUUL basic kits to be resold to various accounts.

75.     JUUL, however, capped the amount of total rebate available to a distributor by allocating to each distributor the number of starter kits and basic kits for which the rebate would be paid.

76.     The rebate from JUUL to be paid to distributors for starter kits and basic kits to be resold to various accounts was effectively a price discount for the products sold to distributors like PBD USA and HSW by JUUL.

77.     HSW received a greater allocation of starter kits and basic kits than PBD USA did for this promotion, and due to the accompanying rebate, a lower price.

78.     Without basis or recognized formula, Juul allotted HSW 120,000 basic kits and 145,000 starter kits, and then credited HSW for all allocations over those amount that included 30,000 more basic kits; all totaling $3.73 million in credits.  **Exhibit PBD__Demo__000005**.

79.     For the same promotion, JUUL allocated only 4,000 basic and 4,000 starter kits to PBD.  JUUL then failed to pay PBD its earned credit of $111,880 under the promotion.

## VIII.   Allocations and Price Discrimination: Spring 2019 Promotion

80.     Beginning in February 2019, JUUL undertook a sales promotion program to run from February 24, 2019 through April 20, 2019.

81.     Under this program, retailers were to be offered $12.00 off the JUUL 2-pack starter kit and $12.00 off the JUUL device kit targeted to vape and c-stores. (**Pl Exhibit 2-12**, Juullabs 04252-4255).

82.     JUUL said distributors would be allocated 200,000 2pk starter kits and 150,000 slate device kits – 350,000 total kits.

83.     JUUL told distributors to start selling to retailers on March 4, 2019 – the same date JUUL sued PBD in DuPage County (19 L 259).

84.     JUUL touted the benefit distributors could expect would be to lift their sales "2-3 times due to dramatically lower consumer price…" (Id., Juullabs04253).

85.     If wholesaler/distributors like PBD and HSW had inventory for the JUUL 4-pack starter kit, retailers would be entitled to $16.00 off the purchase price of the JUUL 4-pack starter kit.

86.     JUUL would fund back to the participating wholesalers/distributors 100 percent of the $12.00 discount on the 2-pack starter and device kits and 100 percent of the $16.00 discount for the 4-pack starter kit sold to retailers from the wholesalers'/distributors' inventory.

87.     Again, JUUL capped the amount of the funding to the wholesalers/distributors to provide such discounts to retailers by allocating each wholesalers/distributor the number of starter kits for which the discount funding would be reimbursed.

88.     The funding of such discounts to retailers through the participating wholesalers/distributors was effectively a price discount for products sold to wholesalers/distributors like PBD and HSW.

89.     HSW received a greater allocation of starter kits and device kits than did PBD, and due to the accompanying rebate, a lower price.

90      Specifically, again without basis or disclosed formula, JUUL allocated HSW 200,000 starter kits plus 150,000 2-pk basic kits and 1,000 4-pk starter kits; a total of 351,000 kits. **(Exhibit PBD_Demo_000007)**.

91.     JUUL additionally allowed HSW to sell more than its allocation (again) and credited or paid HSW for all device sales a total of $9,248,320 which included payments of over $4.8 million for overage "allocations" of open stock totaling another 391,380 kits.  That means JUUL allowed HSW to sell 742,380 kits for this "promo".

92.     The overage allocations alone were:

        127,144(sk)(2pk) x 12 = $1,525,728
        154,128(bk)(2pk) x 12 = $1,849,536
         27,664(sk)(4pk) x 16 = $  442,624
         82,444(sk)(4pk) x 12 = $  989,329
        391,380 sk & bk kits   = $4,807,216 in credits or payments

93.     For icing on this cake - JUUL also issued HSW a "promo shortage credit" of another $355,392.

94.     In stark contrast, for the same promotion, JUUL without industry basis or disclosed formula, allocated PBD a mere 20,000 starter kits and 20,000 basic kits – HSW received about 35 times more allocation than PBD – consistent with Bobby V's June 2018 email that he had given Ahmad "30 times any wholesaler" in allocations.

## X.     Discrimination with Flavored Pods and Returns: October – November 2018

95.     In September 2018, JUUL made an internal, confidential decision to voluntarily stop sales of most flavored refill kits / pods because of mounting US FDA pressure based on concerns related to youth vaping.  JUUL executives planned to "go public" to consumers and its distributors all at once.  On November 13, 2018, JUUL announced the "voluntary" cessation of marketing flavored JUUL pods through distributors like HSW and PBD prior to being regulated or required by the FDA to withdraw flavors and position Juul for investment or purchase by Altria.

96.     Notably, while JUUL ceased marketing the flavors through distributors, it did not stop its distributors from selling their inventory of flavors, nor increasing prices (and thus profits) to distributors with inventory when the inevitable demand drove up prices for flavored pods after the November 13th announcement.[5]

97.     Certain flavors, such as "Mango", were exceedingly popular with consumers. Crème Brule and Mint were not as popular prior to the announcement but distributors such as HSW knew they would become more in demand after the announcement.

---

[5] Juul also continued to market and sell flavored refill kits / pods online.

98.     While purporting to be a good corporate citizen by "voluntarily" stopping the sale of flavored pods to distributors beginning November 13, 2018, JUUL did not stop the sale of MINT flavored pods to distributors, reasonably foreseeing the demand for mint flavored pods would soar.

99.     By January 2019, less than two months later, JUUL issued documented statements that Mint had made up for 90% of the loss sales of Mango flavored pods.  (**Pl Exhibit 2-7**, Juullabs08877, 8887 and 8888).

100.     In addition, in December 2018 – before Altria announced it would pay $12.8 billion for 35% of JUUL - JUUL had decided to start selling flavors to distributors again as early as August 2019. (**Pl Exhibit 2-5**, Juullabs00066-68).

## X.     The Improper JUUL Heads-Up to HSW

101.     Bob Robbins, national sales director for JUUL, was among the insiders at Juul who made or knew of the confidential decision to announce on November 13, 2018 that JUUL would no longer sell flavored pods (except Mint) through distributors. Bob Robbins and Bobby V worked closely together in their respective sales positions with JUUL.

102.     In or around October 24, 2018, JUUL, probably through Bobby V, leaked the confidential decision to HSW about the upcoming withdrawal announcement. This is evidenced by HSW's orders that followed as well as the substantial return credit issued to HSW prior to JUUL's receipt of the product – strictly to maximize HSW's last minute orders before the public announcement.

103.     Starting October 24, HSW then placed over $28 million of invoiced orders through eighteen (18) orders for Juul flavored refill kits/pods (especially for Mango and Crème Brule) through November 12 (Veterans Day holiday).  JUUL through Bobby V also allowed HSW the unprecedented advantage to receive over $2.4 million in advance credit (i.e., the credit issued prior

to JUUL's physical receipt of HSW's underperforming inventory) to return unpopular tobacco flavors at lesser (3%) nicotine strength for 5% strength flavors to facilitate HSW's ability to stockpile flavors that were about to become very profitable to HSW.[6] (**Pl Exhibit 2-112(b)**).

104.    On October 31 alone, HSW sent in six (6) orders totaling over $8 million of flavored pods, almost half of which was for Mango.

105.    In comparison to Bobby V and JUUL allowing HSW to return $2.4 million of lesser selling product for flavored pods, when PBD attempted to return approximately $346,000 worth of defective and damaged products that Juul had sent to PBD in September and October 2018, JUUL refused to allow the return.

106.    Bobby V, working with JUUL accounting, also allowed HSW to run up over $17 million in credit with Juul so HSW could make these "heads-up" pod purchases. (Yet, in July 2018, Bobby V went to extraordinary lengths to stop PBD from making credit based pod purchases because his "main wholesaler (HSW) in the area" did not have that credit capacity as a 4-month new distributor. Of course, PBD was then a legacy JUUL customer and had an excellent credit record with JUUL.[7]

107.    From October 24 through November 12, 2018 (Veterans Day holiday) HSW was allowed to order over $26 Million of flavored pods that were about to become in high demand when Juul made its announcement on November 13th. See the chart of HSW's buying in this period (**Pl Exhibit 2-112(b)**).

---

[6] Juul had a time sensitive return policy that was not followed here for HSW.

[7] Bobby V interceded here for HSW and against PBD even though his own accounting department vouched for PBD noting that: "We have several years of credit support for PBD and only months of payment support from HS Wholesale." Accounting added: "They (PBD) have not been on our radar as a customer to restrict orders as they have built a steady and very communicative relationship with our accounting team. I work with Jeff (Panfil of PBD) on a weekly basis to ensure they have their AR balance and any invoice they need. They (PBD) reach out with every payment including tracking which is sent directly to our lock box. They have not had a check bounce to date." JLI 000382

108.    This "heads up" buying spree with Juul assisted credit included over $2.2 million of returns of 3% tobacco and mint pods for which Juul gave HSW immediate credit to buy an equivalent amount of 5% flavors, especially mango that were much more valuable than the returned pods.

109.    HSW knowingly accepted the head up opportunity and credit extension approval of Juul CFO Tim Danaher to make these illegal purchases of flavored pods with unprecedented extension of credit and returns of lesser valued products.

110.    JUUL did not give PBD or any other distributors a heads up on the cessation of selling flavored pods to distributors.

## XI.    The $16 "Blow Out" of Starter Kits for HSW: February 2019

111.    Even though Bobby V manufactured complaints against PBD about it not reporting its sales to JUUL, PBD did report its sales to JUUL.

112.    That is how JUUL through Jacob Turner was "seeing" on February 6, 2019 that PBD had open stock inventory of 4,928 sleeves of 4-pack starter kits.  Juullabs 8583.

113.    With that knowledge, Bobby V initiated for HSW to buy those kits totaling 19,712 units and then allowing HSW to add them to a promo for which Bobby V offered Ahmad an 80% rebate that was never offered to PBD. (Bobby V agreed to rebate Ahamd $16 of his $20 per unit cost; 80%).

## XII.    JUUL Assist to HSW with Promotional Products and Facilities.

114.    JUUL discriminated in providing services and facilities between PBD by offering JUUL neon signs and JUUL A-Frame signs to enable the favored distributors to provide such services and facilities to the favored distributors' retailers to enhance sales by such retailers to their end-use customers.

115.     The effect of the foregoing discrimination in the furnishing of services and facilities to favored distributors was to injure, destroy, and prevent competition.

116.     The services and facilities provided to distributors like HSW were not proportionally available to plaintiff.

## XIII.   Effect of JUUL's Discrimination

117.     The JUUL devices, kits, and pods which HSW and PBD purchased from JUUL were of like grade and quality.

118.     Defendants JUUL and HSW agreed and/or conspired with one another to set prices (through rebates, promotions, discounts, favorable returns, etc.) that would be noncompetitive on the market.

119.     The JUUL devices, kits, and pods which HSW and PBD purchased from JUUL were in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the JUUL devices, kits, and pods sold to HSW and PBD.

120.     JUUL regularly delivered products to PBD and HSW from outside of the states in which they were sold.

121.     The Robinson-Patman Act provides that price discrimination, *inter alia*, and the conduct generally described in this Complaint is illegal.

122.     The JUUL devices, kits, and pods that were subject to discrimination were sold to HSW and PBD in contemporaneous sales.

123.     The prices at which HSW and PBD resell JUUL devices, kits and pods are a substantial factor in the decision of the customers of HSW and PBD regarding from whom to purchase JUUL devices and other JUUL products.

124.     Plaintiff was not able to purchase the same JUUL products at prices determined by free and open competition and consequently was injured in its business and property in that, *inter alia*, it was forced to pay more than it would have paid in a free, open, and competitive market.

125.     The effective price differences resulting from the favorable allocation of JUUL devices, kits and pods subject to the rebate, as well as the discriminatory returns policy, received by HSW compared to PBD, were substantial and occurred over at least 24 months.

126.     By taking the various actions complained of *supra*, Defendants JUUL and HSW knowingly secured for themselves, and their respective business interests an advantage in competition on the open market.

127.     As a direct result of such price differences, customers of PBD were diverted to HSW.

128.     The discrimination in credits, monetary benefits, and incentive payments was substantial and occurred over at least 24 months.

129.     The discrimination in services and facilities was substantial and occurred over at least 24 months.

130.     As a direct result of the unlawful conduct alleged in this Complaint, prices for JUUL devices, kits, and pods sold by HSW were fixed and maintained at a noncompetitive level.

********
**COUNT I AGAINST JUUL**
**FOR VIOLATION OF SECTION 2(a) OF THE ROBINSON-PATMAN ACT, 15 U.S.C., Chapter 1, § 13(a) FOR PRICE DISCRIMINATION IN RELATION TO ALLOCATIONS, DISCOUNTS, CREDITS AND REBATES**

131.     Plaintiff repeats and realleges Paragraphs 1 through 130 of this Third Amended Complaint as if fully set forth herein.

22

132.    At all relevant times to this action, plaintiff PBD, defendant JUUL, and defendant HSW were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the JUUL devices, kits and pods JUUL sold to PBD and to the distributors like HSW crossed state lines. JUUL regularly delivered products to PBD and HSW from outside of the state in which they were sold.

133.    The JUUL devices, kits and pods sold to PBD, and the distributors were of like grade and quality.

134.    The JUUL devices, kits and pods that were the subject of discrimination were sold to PBD and HSW in contemporaneous sales.

135.    JUUL discriminated against in price between PBD and like distributors by offering rebates on device and kit products of like grade and quality in contemporaneous sales based on allocations that discriminated between these distributors.

136.    The effect of the foregoing price discrimination was to injure, destroy, and prevent competition.

137.    The prices paid by competing distributors like HSW were not functionally available to plaintiff, especially during and around the JUUL summer and fall 2018 promos of devices and kits, JUUL sales of devices, kits and pods that HSW ordered in August 2018, JUUL's "heads up" sales of flavored pods from October 24 through November 12, 2018, the JUUL facilitated $16 "blow out" sale of devices to and by HSW in February 2019, and JUUL's spring 2019 promo of devices and kits.

138.    The foregoing price discrimination violates 15 U.S.C. § 13(a) of the Robinson-Patman Act.

139.    As a direct result of JUUL's violation of 15 U.S.C. § 13(a), plaintiff has sustained injury to its businesses and property in the form of, among other things, lost sales, lost profits, loss of customer goodwill, and loss of potential future sales of devices to repeat customers.

140.    Because of JUUL's conduct, plaintiff has been injured in an amount in excess of $10 million.

## COUNT II AGAINST JUUL
## FOR VIOLATION OF SECTION 2(a) OF THE ROBINSON-PATMAN ACT, 15 U.S.C. § 13(a), REGARDING DISCRIMINATORY RETURNS

141.    Plaintiff repeats and realleges Paragraphs 1 through 140 of this Complaint as if fully set forth herein.

142.    At all relevant times to this action, plaintiff PBD, defendant JUUL, and defendant HSW were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the JUUL devices, kits and pods JUUL sold to PBD and to the distributors like HSW crossed state lines. JUUL regularly delivered products to PBD and HSW from outside of the state in which they were sold.

143.    The JUUL devices, kits and pods sold to PBD, and the distributors were of like grade and quality.

144.    The JUUL devices, kits and pods that were the subject of discrimination were sold to PBD and HSW in contemporaneous sales.

145.    JUUL discriminated in price between PBD and the competing distributors by allowing HSW on or about November 12, 2018 to return or swap lesser strength 3% tobacco and other pods for about $2.2 million of credit to be applied to HSW's credit account to be immediately applied to HSW for it to swap or buy an equal amount of more market valuable 5% flavored pods that JUUL and HSW knew Juul was going to announce to all distributors on the same date later

that JUUL immediately would no longer allow distributors to order flavored pods. Such discrimination in price and credit was for products of like grade and quality and in contemporaneous sales.

146.    The effect of the foregoing price discrimination was to injure, destroy, and prevent competition.

147.    The prices paid by competing distributors like HSW were not functionally available to PBD.

148.    The foregoing price discrimination violates 15 U.S.C. § 13(a) of the Robinson-Patman Act.

149.    As a result of JUUL's violation of 15 U.S.C. § 13(a), plaintiff has sustained injury to its businesses or property in the form of, among other things, lost sales, lost profits, loss of customer goodwill and loss of potential future sales of devices to repeat customers.

150.    Because of JUUL's conduct, plaintiff has been injured in an amount in excess of $10 million.

**COUNT III AGAINST JUUL**
**FOR VIOLATION OF SECTION 2(d) OF THE ROBINSON-PATMAN ACT, 15 U.S.C. §**
**13(d), FOR PRICE DISCRIMINATION ARISING FROM DISCRIMINATORY**
**MONETARY PAYMENTS TO DISTRIBUTORS TO FACILITATE THEIR**
**RETAILERS' PROMOTIONS**

151.    Plaintiff repeats and re-alleges Paragraphs 1 through 150 of this Complaint as if fully set forth herein.

152.    At all relevant times to this action, plaintiff PBD, defendant JUUL, and defendant HSW were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the JUUL devices, kits and pods JUUL sold to PBD and to

25

the distributors like HSW crossed state lines. JUUL regularly delivered products to PBD and HSW from outside of the state in which they were sold.

153.    The JUUL devices, kits and pods sold to PBD, and the distributors were of like grade and quality.

154.    The JUUL devices, kits and pods that were the subject of discrimination were sold to PBD and HSW in contemporaneous sales.

155.    JUUL discriminated in price between PBD and like distributors by offering rebates on device and kit products of like grade and quality in contemporaneous sales based on allocations that discriminated between these distributors.

156.    The effect of the foregoing price discrimination was to injure, destroy, and prevent competition.

157.    The prices paid by competing distributors like HSW were not functionally available to plaintiff, especially during and around the JUUL summer and fall 2018 promos of devices and kits, JUUL sales of devices, kits and pods that HSW ordered in August 2018, JUUL's "heads up" sales of flavored pods from October 24 through November 12, 2018, the JUUL facilitated $16 "blow out" sale of devices to and by HSW in February 2019, and JUUL's spring 2019 promo of devices and kits.

158.    JUUL did not make such payments available to PBD.

159.    By furnishing credits and other payments to favored distributors like HSW but not to PBD to enable the favored distributors to fund promotional items, JUUL was making in-kind payments for promotional items not on proportionally equal terms.

160.    The furnishing of credits and other payments to favored distributors like HSW which were not available to PBD on proportionally equal terms allowed distributors who received

such credits and other payments to fund promotional items and therefore to more effectively compete for the sale of JUUL devices and other JUUL products to their customers than could plaintiffs in competition with such distributors.

161.    The effect of the foregoing furnishing of credits and other payments to fund promotional items not available on proportionally equal terms to PBD was to injure, destroy, and prevent competition.

162.    The foregoing furnishing of credits and other payments to fund promotional items not available to PBD on proportionally equal terms constituted a violation of 15 U.S.C. § 13(d) of the Robinson-Patman Act.

163.    As a direct result of JUUL's violation of 15 U.S.C. § 13(d), plaintiff has sustained injury to its businesses and property in the form of among other things, lost sales and lost profits from devices, kits and pods loss of customer goodwill, and loss potential future sales of devices to repeat customers.

164.    Because of JUUL's conduct, plaintiff has been injured in an amount in excess of $10 million.

## COUNT IV AGAINST HSW
## FOR VIOLATION OF SECTION 2(f) OF THE ROBINSON-PATMAN ACT, 15 U.S.C. § 13(f), FOR PRICE DISCRIMINATION CAUSED BY KNOWING RECEIPT OF DISCRIMINATORY TREATMENT

165.    Plaintiff repeats and re-alleges paragraphs 1 through 164 of this Complaint as if fully set forth herein.

166.    At all relevant times to this action, plaintiff PBD, defendant JUUL, and defendant HSW were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the JUUL devices, kits and pods sold to PBD and to the

distributors. JUUL regularly delivered products to PBD and HSW from outside of the states in which they were sold.

167.    The devices and pods sold to PBD, and the distributors were of like grade and quality, and in contemporaneous sales.

168.    JUUL discriminated in price between PBD and the distributors. Such discrimination in price was for products of like grade and quality, especially during and around the JUUL summer and fall 2018 promos of devices and kits, JUUL sales of devices, kits and pods that HSW ordered in August 2018, JUUL's "heads up" sales of flavored pods from October 24 through November 12, 2018, the JUUL facilitated $16 "blow out" sale of devices to and by HSW in February 2019, and JUUL's spring 2019 promo of devices and kits.

169.    The effect of the foregoing price discrimination was to injure, destroy, and prevent competition to the advantage of the distributors like HSW.

170.    The prices paid by competing distributors like HSW were not functionally available to PBD.

171.    HSW knowingly induced or knowingly received (or reasonably should have known that it was receiving) discriminations in price prohibited by § 13(a) of the Robinson-Patman Act.

172.    The foregoing receipt of price discriminations by HSW violates § 13(f) of the Robinson-Patman Act.

173.    JUUL also furnished credits, monetary benefits and incentive payments, as well as services and facilities, to favored distributors like HSW to fund promotional items.

174.    Such furnishing of credits, monetary benefits and incentive payments, as well as services and facilities, and promotional items was not made available to PBD on proportionally equal terms.

28

175. The furnishing of credits, monetary benefits, and incentive payments, as well as services and facilities, to fund promotional items to favored distributors like HSW but not available to others, including PBD, on proportionally equal terms had the effect of injuring, destroying, and preventing competition to the advantage of favored distributors like HSW.

176. HSW knowingly received credits, monetary benefits, and incentive payments, as well as services and facilities, to fund promotional item not made available to other distributors on proportionally equal team in violation of 15 U.S.C. § 13(f) of the Robinson-Patman Act.

177. As a direct result of JUUL's violation of 15 U.S.C. § 13(a) and HSW's violation of 15 U.S.C. § 13(f), plaintiff has sustained injury to its business and property in the form of, among other things, lost retail sales, lost profits, loss of customer goodwill and loss of potential future sales of devices, kits and pods to repeat customers.

178. Because of the conduct of JUUL and HSW, plaintiff has been injured in excess of $10 million.

### CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Plaintiff PBD respectfully requests that judgment be entered against Defendants JUUL and HSW, granting plaintiff the following relief:

a) Adjudge and decree that Defendants have unlawfully breached Sections 2(a), 2(d), 2(e), and 2(f) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), 13(d), 13(e), and 13(f);

b) Pursuant to 15 U.S.C. § 15(a), treble the damages that are shown to have been sustained by plaintiff by reason of Defendants' above-alleged violations, plus interest, costs, and reasonable attorneys' fees;

29

c)      Grant Plaintiff such other further and different relief as the nature of the case may require or as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Power Buyers Dealers USA, Inc. demands trial by jury of all issues so triable by right.

Dated: March 12, 2025

Respectfully submitted,
/s/     Gary Grasso
By:     Gary Grasso, Esq.
         One of Plaintiff's attorneys

Gary Grasso, Esq. (ARDC #3121760)      James Harrison, Esq.
ggrasso@grassolaw.com            walkerharrison@rogers.com
Adam R. Bowers, Esq. (ARDC #6277163)  Toronto, Canada
abowers@grassolaw.com            *pro hac vice*
GRASSO LAW, P.C.
38 S. Blaine Street, Suite 100
Hinsdale, IL 60521
(630) 654-4500

## CERTIFICATE OF SERVICE

The undersigned, being a paralegal with Grasso Law PC, attorneys of record in the above case, certifies that she caused a copy of the foregoing to be served upon opposing counsel of record via the Court's CM/ECF system on March 12, 2025.

/s/     Christen Korzyniewski
By:     Christen Korzyniewski